**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 1:25-mj-00068 (MAU)** |
| **v.** | |
| **MARIO BUSTAMANTE LEIVA,** | |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION FOR DEFENDANT MARIO BUSTAMANTE LEIVA

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion that the defendant, Mario Bustamante Leiva, be detained pending trial pursuant to 18 U.S.C. § 3142(f)(2)(A) (serious risk of flight) of the federal bail statute. Between April 12, 2025, and April 20, 2025, Bustamante Leiva committed three robberies in the District of Columbia. Each of those robberies targeted individuals in crowded restaurants and followed a similar pattern. Specifically, Bustamante Leiva would enter the restaurant and target an individual with a purse or handbag. Bustamante Leiva would then approach his target, stealthily take their handbag while using his coat to conceal the stolen bag and leave the area. Following each robbery, Bustamante Leiva made fraudulent purchases using the credit cards obtained from the victim of each robbery.

When Bustamante Leiva was arrested in this case, he had an outstanding extraditable arrest warrant out of New York for Grand Larceny in the Fourth Degree – Credit Card. Bustamante Leiva has a lengthy history of committing similar conduct to that for which he is charged in this case. Bustamante Leiva was convicted of a robbery in Chile in 1995 and between 2013 and 2015 was convicted seven times of multiple theft related offenses in the United Kingdom, several of

1

which he committed while released on bail.  Additionally, on April 21, 2025, Bustamante Leiva requested a new passport from the Chilean Embassy and arranged for that passport to be shipped to the Chilean Consulate in New York, suggesting that he intended to leave the jurisdiction.

Bustamante Leiva's actions and criminal history demonstrate that he continues to present a serious risk of flight if released.  Considering the factors specified under 18 U.S.C. § 3142(g), there is no condition or combination of conditions that will reasonably assure his appearance in court.  Accordingly, the Court should detain Bustamante Leiva pending trial.

## BACKGROUND

### *The Instant Offenses*

### The April 17, 2025, Robbery (CCN 25-056018)

On April 17, 2025, MPD officers with the First District responded to 999 9th ST NW, Washington, D.C., for the report of a Theft. Victim-1 reported that while she was having dinner, an unknown suspect, subsequently identified as Bustamante Leiva, stole her purse while it was hanging on the back of her chair. The bag contained Victim-1's credit cards and other personal identifying items. At the time of the report, Victim-1 advised law enforcement that an attempt to use her American Express Card (Amex) ending in 3018 had been made at the Safeway located at 490 L Street NW, Washington, D.C. Victim-1 informed MPD Detective Steven Grysko that she filed a report because her driver's license had been stolen, but Victim-1 did not have an interest in seeing an arrest made or further investigation conducted.

On Tuesday April 22, 2022, Officer Anthony Pearlman reviewed footage from the Westin Hotel, where Victim-1 was dining when her purse was stolen. Officer Pearlman also conducted a follow-up interview with Victim-1.  Officer Pearlman determined that on April 17, two unauthorized transactions were made using Victim-1's Amex credit card ending in 3018 at the

Safeway located at 490 L St NW, Washington, D.C.  The first transaction was made at 9:35 PM in the amount of $12.12.  The second transaction was made at 9:45 PM in the amount of $407.95. Officer Pearlman reviewed checkout transaction records from the Safeway and determined that the $12.12 charge was for a bottle of Josh Cabernet Sauvignon Wine, and the $407.95 charge was for a $400 National Core Amex Gift Card ending in 3742 (VAN 6280), (the Amex gift card).  Your affiant is aware that the activation of and transactions on the Amex gift card are processed by InComm Payments.  All activations and transactions on InComm products are processed and authorized from InComm's servers in Atlanta, Georgia.

Officer Pearlman obtained surveillance footage from the Westin Hotel for the evening of April 17th.  That surveillance video captured Bustamante Leiva walk across the lobby into the dining area at approximately 9:15 PM.  In the video, Bustamante Leiva appeared short and was wearing a hat, a black coat with a logo on the left sleeve and a pronounced white collar on the left side of the neck, black pants, and sneakers with what appeared to be a Nike logo on the side. Bustamante Leiva was wearing a black backpack and was holding more clothing in his left arm.



**Figure 1 - BUSTAMANTE LEIVA entering the Westin at 9:15 PM**.

Bustamante Leiva walked behind Victim-1, who was eating dinner with her family.  In the video, Victim-1's pursue is visible hanging on the back of her chair.  Bustamante Leiva approached the kitchen area, where he stood for a few minutes while holding a coat in his left arm.



**Figure 2 - BUSTAMANTE LEIVA standing near the Kitchen Area and Victim-1. Victim 1's purse is circled in red.**

At approximately 9:18 PM, Bustamante Leiva walked behind Victim-1. As Bustamante Leiva did so, his left arm, which was covered with a coat, brushed over Victim-1's chair. After Bustamante Leiva walked past Victim-1's chair, the purse that had been attached to her chair was gone. Bustamante Leiva proceeded to exit the Westin at approximately 9:20 PM.



**Figure 3 – Left, BUSTAMANTE LEIVA walking past Victim-1. Right, Victim-1's purse no longer on her chair as BUSTAMANTE LEIVA walks away.**

Officer Pearlman contacted Safeway's loss prevention team and requested surveillance video from the Safeway located at 490 L St NW, where Victim-1's Amex credit card ending in 3018 was used approximately 15 minutes after the theft of her purse. Specifically, Officer Pearlman requested video that corresponded with the above referenced transactions.

The surveillance footage from Safeway captured Bustamante Leiva entering the Safeway at 9:32 PM. There are two camera angles that cover the entrance of the Safeway: a side angle and a front facing angle. The side angle camera captured Bustamante Leiva entering the Safeway wearing the same clothing he wore at the Westin: a black coat with white on the collar and a logo on the left arm, as well as a coat hanging over his left arm. The front facing camera captured Bustamante Leiva wearing what appeared to be a Gucci or Louis Vuitton hat and black medical mask.



**Figure 4 – Left, Safeway front entrance camera view of BUSTAMANTE LEIVA entering the store at 9:32 PM. Right, Safeway side entrance camera view of BUSTAMANTE LEIVA entering the store.**

Officer Pearlman reviewed surveillance footage that captured Bustamante Leiva using self-checkout lane #54 at 9:33 PM.  Bustamante Leiva purchased a bottle of what appeared to be "Josh Cabernet" wine using Victim-1's Amex credit card.  This purchase matched the transaction receipt provided to Officer Pearlman by Safeway.  Bustamante Leiva initially appeared to have difficulty making this purchase, but ultimately the transaction was approved.  Bustamante Leiva then went to a manned register and waited in line to purchase an Amex gift card.  At approximately 9:45 PM, Bustamante Leiva successfully purchased the Amex gift card ending in 3742 using Victim-1's Amex credit card. He then left the Safeway heading northbound at approximately 9:47 PM.  As will be discussed further, until April 26, 2025, the Amex gift card ending in 3742 was not activated or used.



**Figure 5 - BUSTAMANTE LEIVA making a purchase on April 17, 2025, at 9:35 PM using Victim-1's credit card.**



**Figure 6 - BUSTAMANTE LEIVA making a second purchase on April 17, 2025, at 9:45 PM using Victim-1's credit card.**

MPD Personnel canvased for video in an effort to determine Bustamante Leiva's travel both before and after he was observed on video at the Westin and the Safeway on April 17. While doing so, law enforcement recovered additional surveillance video capturing Bustamante Leiva wearing a pair of camouflage-patterned shoes and learned of additional incidents associated with this investigation.

Law enforcement determined that prior to Bustamante Leiva stealing Victim-1's purse at the Westin, Bustamante Leiva appeared to have committed a similar theft at the Dolcezza coffee shop located at 904 Palmer Way NW, Washington, D.C. Surveillance video provided to MPD by the United States Mint Police captured Bustamante Leiva near the Dolcezza coffee shop from earlier in the evening of April 17. Officer Pearlman recovered additional surveillance video from the Dolcezza coffee shop that captured Bustamante Leiva standing in line at approximately 8:47 PM. In that video, Bustamante Leiva appears to be wearing the same clothing he wore during the theft at the Westin and while he was making fraudulent purchases at Safeway using Victim-1's Amex credit card.



**Figure 7- A zoomed-in still image of BUSTAMANTE LEIVA standing in line at the Dolcezza near a group of seated customers on April 17, 2025.**

While standing in line outside of the Dolcezza, Bustamante Leiva positioned himself so that he was standing next to a group of customers who were seated at an outdoor table. While standing near the table, Bustamante Leiva used his left leg to pull a tan shoulder bag towards him. Bustamante Leiva proceeded to lean down and take a rectangular item from the customer's shoulder bag. The rectangular item appeared consistent with the shape and size of a wallet or purse. Bustamante Leiva then entered the coffee shop and appeared to look at the menu before exiting the shop and walking towards the Westin. The Westin is approximately one block away from the Dolcezza.



**Figure 8 - A zoomed-in still image of BUSTAMANTE LEIVA reaching down into a customer's shoulder-bag to remove what appears to be a purse or wallet.**



**Figure 9 - BUSTAMANTE LEIVA at the Dolcezza Coffee Shop on April 17, 2025.**



**Figure 10 – The Dolcezza coffee shop and the Westin DC Downtown.**

On or about April 21, 2025, USSS-UD disseminated a BOLO to MPD depicting the suspect involved in the April 20th robbery. In response to the BOLO, Officer Pearlman contacted USSS with an identification of the suspect, Officer Pearlman also provided information that appeared to connect the April 20th robbery to a series of offenses that had occurred in the District of Columbia.[1]

---

[1] A 'Be-On-The-Lookout' flier was disseminated early in the investigation by USSS-UD using *Figure* 20 or a close likeness of it. In response, a police officer with the Metropolitan Police Department made an identification of the suspect, providing a name and date of birth. That individual's information is known to law enforcement and is available should the Court deem it necessary at this stage. Your affiant and others were able to determine, through the JUSTIS portal, that this individual was in custody at the time of the offense awaiting a mental competency hearing.

Officer Pearlman and Detective David Gargac shared their investigation with the United Secret Service in a joint effort to locate and apprehend Bustamante Leiva.

The BOLO for the suspect in the April 20th Capital Burger robbery depicted a short white male, possibly Asian or Hispanic, wearing a black coat with white fur on the collar, grey pants, an unknown brand hat, and unknown brand sneakers. The BOLO images of Bustamante Leiva in the checkout line at Safeway on April 17 appeared to show Bustamante Leiva wearing the same coat.

As part of this investigation, law enforcement canvased homeless shelters and service centers in close proximity to the Safeway located at located at 490 L Street NW. An employee at a nearby community services center recognized the individual in the BOLO from surveillance video of a theft that had occurred at a Nando's several days earlier.  Officer Pearlman contacted Nando's to obtain additional information about this incident.

### The April 12, 2025, Robbery (CCN 25-053341)

On Saturday, April 12, 2025, at approximately 8:30 PM. Victim-2 reported to MPD that her purse had been taken from the back of her chair while she was dining at the Nando's restaurant located at 836 F Street NW, Washington, D.C.  Law enforcement recovered surveillance video from the Nando's that captured Bustamante Leiva stealthily removing Victim-2's purse from the back of her chair and exiting the Nando's.  During this offense, Bustamante Leiva appeared to be acting in concert with a second individual, Suspect-2.  Victim-2 provided law enforcement with transaction records from her credit/debit cards that were stolen with her purse.  Those records indicated that an unauthorized transaction had been made using one of Victim-2's cards and that an attempted transaction was a made on second card that was declined.

---

As a result, law enforcement has been able to exclude him as having participated in the events described above.

Surveillance video from the Nando's exterior captured Bustamante Leiva and Suspect-2 as they walked past the establishment at approximately 8:30 PM and paused outside for several seconds while they appeared to look through the front window.   Suspect-2 entered the Nando's while Bustamante Leiva removed his jacked and draped it over his left arm.  Bustamante Leiva's placement of his jacket was similar to how he carried a jacket during the April 17th robbery. Additionally, the jacket worn by Bustamante Leiva appeared to be the same jacket he wore during the April 17th and the April 20th robberies.



**Figure 11 - BUSTAMANTE LEIVA (circled in red) and Suspect-2 outside the Nando's on April 12, 2025.**

Once inside the Nando's, Suspect-2 and Bustamante Leiva approached the table where Victim-2 was seated and stood nearby.  Suspect-2 appeared to position himself to block the back of Victim-2's chair from view.  v continued to move closer to Victim-2 and grabbed Victim-2's purse while simultaneously using his jacket to conceal the purse.  Bustamante Leiva and Suspect-2 then departed the Nando's.



**Figure 12 – BUSTAMANTE LEIVA and Suspect-2 enter the Nando's at approximately 7:31 PM. Suspect-2 appears to block the view of the back of Victim-2's chair while BUSTAMANTE LEIVA grabs Victim-2's purse with his left hand hides it under his coat.**

After leaving the Nando's, Bustamante Leiva and Suspect-2 traveled to the Safeway at 490 L Street NW. Surveillance video captured Bustamante Leiva and Suspect-2 entering the Safeway at approximately 8:04 PM. Suspect-2 proceeded to purchase a $500 Visa gift card ending in 9034 using Victim-2's credit card, which Bustamante Leiva had stolen approximately a half-hour prior. Surveillance video captured Bustamante Leiva departing the Safeway at approximately 8:11 PM. Suspect-2 exited the Safeway a few minutes after Bustamante Leiva. Your affiant is aware that the activation of and transactions on the Visa gift card are processed by InComm Payments. All activations and transactions on InComm products are processed and authorized from InComm's servers in Atlanta, Georgia.



**Figure 13 – Suspect-2 and BUSTAMANTE LEIVA entering the Safeway on April 12, 2025, at approximately 8:04 PM.**

Officer Pearlman received transaction records for the Visa gift card, which revealed a phone number used to check the balance of the gift card. The records also documented approximately $462 worth of charges between April 12, 2025, and April 16, 2025. These records and the investigation were shared with the Secret Service, who were investigating the April 20 robbery at Capital Burger. During a review of these transaction records, law enforcement observed an April 12th transaction for a hotel stay at the Motel 6 located at 6711 Georgia Avenue NW, Washington, D.C., an April 14th transaction for a hotel stay at Quality Inn located at 7212 Richmond Highway, Alexandria, VA, and finally, an April 15th transaction at a 7-Eleven located at 3100 Lockheed Boulevard, Alexandria, VA. Additionally, numerous charges were made at the King Street metro station in Alexandria, VA.

Officer Pearlman contacted Metro Transit Police Department (MTPD) investigators, who flagged SmarTrip cards the suspects added money to using the fraudulently purchased gift card. MTPD provided clear images of Bustamante Leiva and Suspect-2, both without face masks, on April 15 at the King Street metro station. These images are from surveillance video that captured

Bustamante Leiva and Suspect-2 after they used the Visa gift card that was purchased using Victim-2's stolen credit card. In one of the images provided by MTPD, Bustamante Leiva is carrying a black jacket with a white collar that appears to identical to the jacket he wore during the April 12th, April 17th, and April 20th offenses.



**Figure 14 – Suspect 2 (left) and BUSTAMANTE LEIVA (right) at the King Street metro station on April 15, 2025.**

MTPD also provided MPD personnel with Bustamante Leiva's last movements related to the flagged SmarTrip card on April 21, 2025. The transactions showed Bustamante Leiva enter the Dupont Circle metro station at approximately 03:26 PM and exit at Silver Spring metro station approximately 30 minutes later. In video from the Silver Spring station, Bustamante Leiva is wearing a Navy collared shirt and camouflage sneakers. The camouflage sneakers appear to match the sneakers that Bustamante Leiva was wearing during the April 17th offense at the Westin.



**Figure 15 - BUSTAMANTE LEIVA at the Silver Spring metro station on April 21, 2025.**

MPD Personnel and members of the United States Secret Service conducted follow up canvases at the locations linked to the Visa gift card transactions. With respect to the Motel 6 transaction, law enforcement received information from the Motel 6 reservation and payment system. Between April 12, 2025, and April 14, 2025, Suspect-2 used the $500 Visa gift card ending in 9034 to pay for a room through a Booking.com reservation (Confirmation # 4063AKL383). Suspect-2 provided his name for this reservation. No camera footage of the Motel 6 stay was available. Officer Pearlman conducted a law enforcement database search which revealed a recent pawn transaction conducted by Suspect-2 in Maryland. The pawn search and follow-up provided a NYC Identification card and phone number for Suspect-2, the latter of which is different than the phone number associated with the Booking.com reservation.

Later the same evening, law enforcement received information from Quality Inn as to the particular details of the transactions involving the Visa gift card between April 14, 2025, and April 16, 2025. As part of the booking and check-in process at the Quality Inn, the customer was required to provide identifying information. At the time of booking, Suspect-2 again provided the same name that he provided to the Motel 6. Quality Inn front desk staff reported to law enforcement that Bustamante Leiva and Suspect-2 were together at the time of check in.  When Suspect-2 checked in at the Quality Inn, he was required to provide a payment method and identification document. Suspect-2 provided the fraudulently obtained Visa gift card for payment and a counterfeit California ID card in his name, the former being recovered during a later search of Bustamante Leiva's hotel room that he was occupying at the time of his April 26th arrest.



**Figure 16 – The gift card ending in 9034 and the counterfeit California ID.**

Law enforcement obtained surveillance footage from the Quality Inn depicting Bustamante Leiva inside the lobby, and an individual consistent in appearance with Suspect-2 walking with Bustamante Leiva outside of the hotel. MPD and Secret Service personnel also spoke with Quality Inn staff who interacted with Bustamante Leiva during his stay. Specifically, the Quality Inn staff recalled an incident during which Bustamante Leiva engaged in a verbal altercation with a shift manager over his refusal to return to his assigned room (Room 231) after being asked to do so on account of being intoxicated. The staff member that was interviewed did not recall the exact time Bustamante Leiva checked out but did recall that Bustamante Leiva left behind a black Samsung A12 cellphone that was recovered by Quality Inn staff.  The Secret Service recovered the cellphone as evidence.

MPD personnel also retrieved surveillance video of the April 15th transaction at the 7-Eleven located at 3100 Lockheed Boulevard, Alexandria, VA.  This 7-Eleven, and the Quality Inn where Suspect-2 and Bustamante Leiva stayed, are located approximately 600 feet apart.  Law enforcement determined that the Visa gift card, that had been purchased using Victim-2's stolen credit card, had been used at approximately 6:30 PM on April 15, 2025. Surveillance video from the 7-Eleven captured Suspect-2 and Bustamante Leiva enter the store at approximately 6:30 PM. In that video, Bustamante Leiva is wearing what appears to be the same black coat with a white collar and the camouflage sneakers that he wore during the April 17th robbery at the Westin.

**The April 20, 2025, Robbery (CCN 25-057560)**

In the evening hours of April 20, 2025, an individual under the protection of the United States Secret Service (hereafter Victim-3) was dining at the Capital Burger restaurant, located at 1005 7th Street Northwest, Washington, D.C. While at the restaurant, Victim-3 noticed that her purse – that she had placed at her feet – was now missing. Victim-3 alerted her Secret Service

detail, who in turn ultimately alerted the Secret Service's Washington Field Office ("USSS-WFO"). Victim-3 subsequently provided an itemized list of property stolen from her purse, which included several of her personal credit cards and her United States Government Personal Identification Verification card. Members of the Uniformed Division of the United States Secret Service ("USSS-UD") subsequently classified the offense as Robbery Stealth and prepared a police report describing the general circumstances of the offense.

USSS-WFO and USSS-UD personnel (collectively, the "United States Secret Service" or "Secret Service") subsequently reviewed and obtained video from the Capital Burger. In relevant part, Bustamante Leiva entered the business at approximately 7:52 PM and sat down at a table within arm's reach of Victim-3. Bustamante Leiva sat down in the chair closest to Victim-3 and pushed the chair back from his table and in the direction of Victim-3. In the context of this investigation, investigators believe this action was deliberate and done in an effort to get closer to Victim-3's belongings. The suspect then looked downward (likely in the direction of Victim-3's purse) and then at a child milling around nearby. CCTV footage from Capital Burger captured Victim-3's purse at her feet and the base of her chair, and in the immediate possession of Victim-3.



**Figure 17 – BUSTAMANTE LEIVA along with the item determined to be Victim-3's purse.**

Seconds later, Bustamante Leiva twisted his body to his left towards Victim-3's purse and moved his left leg. Simultaneous to that movement, an object determined to be Victim-3's purse was seen moving out of camera view and in the direction of the suspect (between the 49 and 51 second mark of the aforementioned video). The video then captured the suspect bend down with his jacket in one hand and, with his other hand, pick up an object from the floor that law enforcement determined to be Victim-3's purse (beginning at the 1 minute and 3 second mark of the video). The entirety of the referenced video is in the possession of the Secret Service.



**Figure 18 – Victim-3's purse pre and post offense**.



**Figure 19 – BUSTAMANTE LEIVA picking up Victim-3's purse.**

Bustamante Leiva then got up from his seat and exited the business. Bustamante Leiva appeared on video to be an older, lighter-skin male, medium-to-heavyset build, wearing a dark colored jacket with a thick white collar and a white emblem on the left arm, jeans, a white Covid-

style mask, and a dark colored hat with a square-shaped logo on the front of it. A photo of Bustamante Leiva was shared with law enforcement.



**Figure 20 – BUSTAMANTE LEIVA inside the Capital Burger restaurant.**

During the course of this investigation, U.S. Secret Service personnel conducted an extensive canvass for video that would have captured Bustamante Leiva's travel both before and after the robbery of Victim-3. This section contains information learned by US Secret Service personnel as to the suspect's travel *before* the offense.

Law enforcement determined that Bustamante Leiva arrived in the immediate area of the offense location by a bus operated by the Washington Metropolitan Area Transit Authority ("WMATA"). Specifically, it was determined that an individual consistent in description to that of Bustamante Leiva boarded WMATA bus number 7248 at 7th Street and Indiana Avenue Northwest in the District at approximately 7:38 PM. Prior to boarding the bus, Bustamante Leiva was observed approximately one block north of the bus stop. Secret Service personnel obtained

surveillance footage that depicts Bustamante Leiva with clarity and without obstruction. It was immediately apparent to investigators upon being provided this image that this individual was Bustamante Leiva – based on clothing and physical characteristics – who stealthily robbed Victim-3 of her purse and belongings a short time later.



**Figure 21 – BUSTAMANTE LEIVA near 7th and D Streets NW.**

Bustamante Leiva took the 79-Bus towards Silver Spring from 7th Street and Indiana Avenue NW, exiting a short time later at the bus stop located at 7th and L Streets NW. Surveillance footage obtained from the Walter E. Washington Convention Center depicted the individual exiting the bus at 7:44 PM.

The video footage captured a medium-to-heavyset built male, wearing a dark colored jacket with a thick white collar, jeans, a white Covid-style mask, and a dark colored hat with a square logo on the front of it.



**Figure 22 – BUSTAMANTE LEIVA exiting the bus.**

After unlawfully taking Victim-3's purse and related property, Bustamante Leiva fled on foot in an eastward direction on Massachusetts Avenue Northwest. United States Secret Service's investigative efforts determined that Bustamante Leiva had discarded Victim-3's driver's license in the vicinity of the 600 block of Massachusetts Avenue NW. Bustamante Leiva subsequently boarded a WMATA-operated bus in Chinatown. An individual matching the description of Bustamante Leiva was later observed exiting a WMATA-operated bus at 30th and M Streets NW at approximately 8:34 PM.

After exiting the bus, Bustamante Leiva walked across the street to the Angolo Ristorante Italiano restaurant, located at 2934 M Street NW. After initially sitting down at a table within the restaurant, he decided to sit at the bar, where he stayed until about midnight. Secret Service personnel determined that while at the bar, Bustamante Leiva *successfully* utilized several of Victim-3's credit cards to purchase food and alcohol. Bustamante Leiva made a total of five purchases using Victim-3's American Express credit cards in the amount of $205.87. Your affiant is aware that American Express's servers are located in Phoenix Arizona and that a signal is transmitted to those servers when a transaction is made using an American Express credit card.



Victim-3's credit card

**Figure 23 – BUSTAMANTE LEIVA using Victim-3's credit card.**

Surveillance footage from the restaurant captured Bustamante Leiva in possession of some of Victim-3's property, including Victim-3's stolen purse, Victim-3's stolen wallet and at least one of Victim-3's credit cards (the latter of which the restaurant was able to match to two of the transactions made by Bustamante Leiva). Bustamante Leiva appeared on surveillance video to be wearing a dark jacket with a white emblem on the left arm and a thick white collar, jeans, a dark hat with a square logo on the front, and a white Covid-style mask.



**Figure 25 – BUSTAMANTE LEIVA with Victim-3's purse and wallet.**

Secret Service personnel determined through their review of surveillance footage that while Bustamante Leiva was patronizing the restaurant, he plugged in a cellphone to charge it. After departing the restaurant, Bustamante Leiva was observed by the same surveillance system falling asleep at an outdoor table, where he remained until approximately 7:30 AM the following morning. Bustamante Leiva was last observed on surveillance video walking eastbound on Pennsylvania Avenue NW near the Four Seasons Hotel in Georgetown at approximately 07:35 AM on April 21.

### Identification of Bustamante Leiva

On April 26, 2025, U.S. Secret Service investigators learned about report 250016968 from the Montgomery County Police Department (MCPD) in Silver Spring, Maryland, in which Bustamante Leiva identified himself to law enforcement and reported that he was the victim of a theft. Specifically, on April 19, 2025, at 02:23 AM, MCPD officers responded to 8240 Fenton

Street, Silver Spring, MD for a theft. Once on scene, officers met with Mario Bustamante Leiva who, through a Spanish interpreting officer, advised the following: Around 02:00 AM, Bustamante Leiva, who has no fixed address and is currently unhoused, fell asleep on a bench in front of the above referenced address around 02:00 AM. When Bustamante Leiva woke up, his bag containing all of his belongings was gone. Bustamante Leiva advised that in the bag were several pieces of clothing including shoes, his Chilean passport, and over $1,000 in cash. Bustamante Leiva was somewhat uncooperative and smelled heavily of an alcoholic beverage.

### Total Fraudulent Expenditures

Below is a summary of the fraudulent expenditures made by Bustamante Leiva and Suspect-2 using the victims' stolen credit cards:

a. On or about April 12, 2025, Bustamante Leiva and Suspect-2, used Victim-2's stolen credit card to purchase a VISA gift card in the amount of $507.95. Bustamante Leiva and Suspect-2 used the VISA gift card to pay for lodging at the Georgia Avenue Motel 6 on April 12 and the Alexandria Quality Inn on April 14. On April 15, Bustamante Leiva and Suspect-2 used the VISA gift card to make a purchase at a 7-Eleven in Alexandria, VA.

b. Bustamante Leiva used Victim-1's stolen credit card to make fraudulent purchases in the amount of $409 on April 17, 2025.

c. Bustamante Leiva used Victim-3's stolen credit cards to make fraudulent purchases in the amount of $205.87.

### Bustamante Leiva's Arrest on April 26, 2025

From the date of Bustamante Leiva's purchase of the Amex gift card using Victim-1's stolen credit card, Officer Pearlman periodically checked, through the gift card payment provider,

for activity on the card.  The payment provider's fraud investigators also monitored the card for activity after hours and over the weekend. On April 26, 2025, a fraud investigator checked the Amex gift card's transactions and alerted Officer Pearlman and Detective Gargac that the Amex gift card had been activated and was using a phone number ending in 5732. The fraud investigator further advised that the gift card had been used to make a purchase at the Motel 6 located at 6711 Georgia Ave NW, Washington, D.C., on April 26, 2025, at approximately 10:24 AM. Officer Pearlman notified members of the United States Secret Service, who determined that the phone number used to activate the gift card was a T-Mobile number. Using commercial databases, law enforcement determined that the phone number is registered to "Mari Buscamante."

Additionally, law enforcement was aware that Bustamante Leiva and Suspect-2 had previously stayed at this location on April 12th and April 13th using the gift card purchased with the funds from Victim-1's stolen credit card. Investigators responded to the Motel 6 and queried the reservation system for the last four digits of the Amex gift card number ending in 3742. The second result on the list showed a reservation starting on April 21 and extending through April 27. The name provided for this reservation was Mario Bustamante with a room number of 311. The reservation revealed Bustamante Leiva likely used a photocopy of a Chilean passport in the name of "Mario Enrique Bustamante Leiva" as an identification document. Surveillance footage of the check in on April 21, 2025, was also reviewed, and investigators recognized Bustamante Leiva by face and clothing.

Investigators knocked on the door of Room 311 and Bustamante Leiva answered the door. USSS and MPD personnel recognized Bustamante Leiva as the suspect in the BOLOs prepared by MPD and USSS in connection with the April 12th, 17th and 20th incidents.  MPD personnel then placed Bustamante Leiva under arrest and escorted him to the lobby of the hotel.  USSS and MPD

personnel secured the scene and continue to hold Room 311 secure until investigators secured a search warrant. Bustamante Leiva was transported to the Hospital after complaining of alcohol withdrawal. Once cleared from the hospital, Bustamante Leiva was transported to the US Secret Service's Washington Field Office where he was interviewed by MPD and USSS personnel.

## Interview of Bustamante Leiva

Bustamante Leiva was interviewed by Officer Pearlman, Detective Gargac, and USSS Special Agent May. Bustamante Leiva is primarily Spanish-speaking, thus Detective Benjamin was present to act as a translator. The interview was video and audio recorded. What follows is a short summary of the interview. Bustamante Leiva was advised of his Miranda rights and subsequently waived them. Bustamante Leiva was first shown a body-worn camera (BWC) photograph of himself from the April 19, 2025, report he made about being the victim of a theft. Bustamante Leiva identified himself and advised that five black males had robbed him while he slept on the bench. Bustamante Leiva was wearing what appeared to be the same black coat with white fur in the BWC photograph he was shown that he was observed wearing on surveillance video during the offenses under investigation.

Bustamante Leiva stated that he was an alcoholic and therefore that he has memory issues. During the interview Bustamante Leiva admitted to stealing Victim-3's purse/bag. He stated that the purse/bag was underneath Victim-3's chair and that he used his feet to slide it out from underneath the chair. Bustamante Leiva then picked up the purse/bag and fled. Bustamante Leiva advised that he kept the purse and wallet that was inside of it. The rest of the contents he threw in the trash. Bustamante Leiva claimed that he still had the purse and that it was in the Motel room. Bustamante Leiva verified that he had the shoes and coat that were worn during the offenses inside the hotel room. Bustamante Leiva was shown a photograph of Victim-3 and denied any

prior knowledge of who they were. Bustamante Leiva had a good recollection of this offense but stated he could not remember the other offenses he committed.

Bustamante Leiva was shown video stills from the April 12th and April 17th offenses.  He identified himself in the video stills. Bustamante Leiva was also shown a news story form a British publication detailing his arrest in 2014 for a series of thefts that occurred in London, England.  The story detailed that Bustamante Leiva had been arrested in London for stealing designer bags and purses. The article included a photograph of Bustamante Leiva. Bustamante Leiva was shown this photograph and he verified that it was him.

Bustamante Leiva was also questioned about Suspect-2. Bustamante Leiva stated that he had recently met Suspsect-2 days prior in Washington, D.C.  v disclosed that he and Susepct-2 had rented motel rooms together to save money.  Bustamante Leiva was shown photographs of Suspect-2 and verified them as such. Bustamante Leiva repeatedly stated that the gift cards he used were provided by Suspect-2. Bustamante Leiva advised that the Amex gift card used on the morning of April 26, 2025, that led to his arrest, was not his.

## Search Warrant Execution

On April 27, 2025, at approximately 12:28 AM, members of the USSS along with Officer Pearlman and Detective Gargac executed a D.C. Superior Court Search Warrant at 6711 Georgia Ave NW, Room 311.  Law enforcement recovered from Room 311 Victim-3's purse and wallet, an Amex gift card ending in 3742, a Black Jacket with a white fur collar, a pair of Nike camouflage sneakers, a business card belonging to the manager of the Quality Inn in Alexandria, VA, approximately $3,174.35 in United States currency and a five Euro note, and a WMATA SmarTrip card.  The jacket and Nike and sneakers that were recovered from Room 311 appeared to match the jacket and sneakers worn by Bustamante Leiva during the robberies on April 17th and April

20th. The recovered SmarTrip card was confirmed to be the same SmarTrip card referenced earlier in this affidavit and that was flagged by MTPD as belonging to BUSTAMANTE LEIVA.

### *Procedural History*

On April 28, 2025, a Criminal Complaint charging Bustamante Leiva with violations of 18 U.S.C § 1343 (Wire Fraud), 18 U.S.C. § 1028A (Aggravated Identity Theft), and 22 D.C. Code § 2801 (Robbery) was signed by the Honorable Moxila A. Upadhyaya of the United States District Court for the District of Columbia. An initial appearance was held before Magistrate Judge Upadhyaya on April 28, 2025. At that hearing, the Government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(A).

## ARGUMENT

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e).

In determining whether an individual is a flight risk, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g); *see also United States v. Vasquez-Benitez*, 919 F.3d 546, 551-51 (D.C. Cir. 2019). "A determination that an individual is a flight risk must be supported by a preponderance of the evidence. *Vasquez-Benitiz*, 919 F.3d at 551.

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."

18 U.S.C. § 3142(f).  Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer.  *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use."  *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986).  *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992).  A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery.  *See Smith*, 79 F.3d at 1210, and *Williams*, 798 F. Supp. at 36.

Here, if released, Bustamante Leiva poses a flight risk.  He has no ties to the community, has an extraditable bench warrant out of New York for failing to appear for court, and has previously failed to appear for court in the United Kingdom.  Additionally, on April 21, 2025, Bustamante Leiva requested a new passport from the Chilean Embassy and arranged for that passport to be sent to the Chilean Consulate in New York, suggesting that he intended to leave Washington, D.C.

## I.    <u>The Nature and Circumstances of this Offense Merits Detention.</u>

Here, Bustamante Leiva is charged with committing three robberies between April 12, 2025, and April 20, 2025, after which he made fraudulent purchases using the credit cards obtained from the victim of each robbery.  Although these were non-violent offenses, each offense occurred in a crowded public space during the evening.  Equally troubling is the frequency of these offenses, all of which occurred during an eight-day period and the fact that Bustamante Leiva may have committed an additional robbery on April 17, 2025.  And reflecting the seriousness of the charged

offenses is the two-year mandatory minimum term of incarceration the defendant would face if convicted of Aggravated Identity Theft.  Therefore, the first factor favors detention.

## II.     **The Weight of the Evidence Against Bustamante Leiva Favors Detention.**

The second factor to be considered, the weight of the evidence, also favors detention. The Government's case against Bustamante Leiva is strong.  Bustamante Leiva is linked to each of the charged offenses by surveillance video that captures each robbery as well as Bustamante Leiva's use of the victims' credit cards.  Bustamante Leiva was captured on surveillance video wearing a black jacket with a white fur collar during the April 17th and 20th robberies. During the April 12th robbery, Bustamante Leiva used that same jacket to hide the victim's stolen purse following the robbery.  During the execution of a search warrant at a hotel where there defendant was staying on April 27, 2025, law enforcement recovered the black jacket with a white fur collar, a pair of Nike camouflage shoes that match the shoes worn by the defendant during the April 17th and 20th robberies, Victim-3's purse and wallet, an Amex gift card that was purchased using one of the victim's credit cards, and approximately $3,174.35 in United States currency. Finally, when interviewed by law enforcement, Bustamante Leiva admitted to his involvement in the April 20th robbery and identified himself in still images from surveillance video of the April 12th and April 17th robberies.

Here, the weight of the evidence should be considered equally with the other § 3142 factors. In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors."  2023 U.S. Dist. LEXIS 18988, at *29-30.  Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine

whether pretrial detention is appropriate." *Id.* In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). Moreover, the Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight.

Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 U.S. Dist. LEXIS 18988, at *29-30. So it is in this case, the weight and strength of the evidence increases the prospect that Bustamante Leiva will flee if released. Accordingly, the second factor favors detention.

### III.   Bustamante Leiva's History and Characteristics also Favor Detention.

The third factor—the history and characteristics of the defendant—heavily favors detention, as Bustamante Leiva has a history of committing theft-related offenses, including while on pre-trial release.

On March 14, 1995, Bustamante Leiva was convicted of a Robbery in Chile and sentenced to 3 years imprisonment. *See* Exhibit A at 3. Additionally, Bustamante Leiva has been repeatedly convicted of theft related offenses in the United Kingdom. On October 31, 2013, Bustamante Leiva was convicted of one count of Theft and sentenced to 13 weeks imprisonment. *See* Exhibit A at 3. On January 7, 2014, Bustamante Leiva was convicted of two counts of Theft From Person but was not sentenced to an additional period of incarceration. *See* Exhibit A at 3. On December 15, 2013, Bustamante Leiva was convicted of one count of Theft and sentenced to 17 weeks

imprisonment.  *See* Exhibit A at 3.  On March 11, 2015, Bustamante Leiva was convicted of one count of Theft and sentenced to 12 weeks imprisonment.  *See* Exhibit A at 4.  On March 23, 2015, Bustamante Leiva was convicted of one count of Attempt Burglary with Intent to Steal – Dwelling and sentenced to 12 months incarceration.  *See* Exhibit A at 4.  That same day, Bustamante Leiva was convicted of 11 counts of Theft and sentenced to 3 years' incarceration.  *See* Exhibit A at 4-5.

Additionally, Bustamante Leiva has a history of failing to comply with court orders.  On April 10, 2014, Bustamante Leiva was convicted of Failing to Surrender to Custody at Appointed Time in the City of London, South London Magistrates Court.  Bustamante Leiva committed the Theft for which he was convicted on April 15, 2014, while he was released on bail.  *See* Exhibit A at 3.  And Bustamante Leiva committed the 11 counts of Theft for which he was convicted on March 23, 2015, in London's Central Criminal Court, while he was on bail.  *See* Exhibit A at 4-5.

Mr. Bustamante Leiva also has an outstanding extraditable warrant from New York County, New York, for Grand Larceny in the Fourth Degree – Credit Card, and Criminal Possession of Stolen Property in the Fifth Degree.  In that matter, following Bustamante Leiva's arrest on March 2, 2025, he failed to appear in court on March 19, 2025.

Despite previous terms of incarceration and pre-trial release opportunities, Bustamante Leiva has continued his pattern of criminal behavior.  And Bustamante Leiva's history and characteristics are distinguishable from circumstances in which the D.C. Circuit has held that a defendant was not a flight risk.  *See Vasquez-Benitez*, 919 F.3d at 551 (defendant not a flight risk where he had a wife, two children and a job in the D.C. area, had one prior conviction that was 15 years old, had previously appeared for prior court proceedings, and needed to not flee in order to obtain withholding of removal in his immigration case); *United States v. Xulam*, 84 F.3d 441, 442

(D.C. Cir. 1996) (defendant not a flight risk where defendant faced non-violent charge, had no criminal record or record of failure to appear, was employed and had ties to the community, including a proposed third-party custodian).

Accordingly, the third factor weighs heavily in favor of continued detention. *See United States v. Munchel*, 991 F.3d 1273, 1281 (D.C. Cir. 2021) (concluding that courts can and should "consider whether it believes the defendant will actually abide by its conditions when making the release determination"); *see, e.g., United States v. Glasgow*, No. 1:20-cr-27-7 (KBJ), 2021 U.S. Dist. LEXIS 109972, at *37 (D.D.C. June 11, 2021) ("Because Glasgow has previously disobeyed a court-ordered condition of pre-trial supervision, the Court has little faith that he would not do so again if released pending trial.").

## IV.    Bustamante Leiva Presents a Danger to Our Community.

Bustamante Leiva presents a danger to the community and a flight risk. The facts of this case, along with his history and characteristics, make clear that if released, Bustamante Leiva will continue to engage in the pattern of criminal conduct with which he has been charged.  And while these are nonviolent offenses, these are not victimless crimes.  Each robbery impacted the victim's sense of safety and security while Bustamante Leiva profited from their loss.  Moreover, the instant offenses are just the most recent in a decades-long criminal history that spans continents.  And despite repeated periods of incarceration, the defendant's criminal conduct has not abated.

Similarly, if released, Bustamante Leiva is likely to flee the jurisdiction.  Unlike many defendants who come before this Court, Bustamante Leiva has no ties to the District of Columbia or the surrounding area.  His family does not reside here, and he does not have a permanent address in the area.  Therefore, Bustamante Leiva cannot be released to a third-party custodian who could assure his presence at future court proceedings.  Finally, law enforcement is aware that on April

21, 2025, Bustamante Leiva went to the Chilean Embassy to report that his passport and valuables had been stolen. Bustamante Leiva requested an emergency passport which was provided to him after embassy personnel verified his identity. Bustamante Leiva also requested that his new passport be mailed to the Chilean consulate in New York. To date, law enforcement has not recovered Bustamante Leiva's emergency passport. If released, Bustamante Leiva could potentially use one of these passports to flee the jurisdiction. And as Bustamante Leiva's criminal history makes clear, he has ties to Chile and the United Kingdom. Accordingly, there is no condition or combination of conditions that would reasonably assure that Bustamante Leiva would return to court if he were released.

## **CONCLUSION**

The government respectfully requests that the Court issue an Order granting its motion that the defendant be held without bond pending trial.

Respectfully submitted,

EDWARD R. MARTIN, JR.
UNITED STATES ATTORNEY
D.C. Bar No. 481866

By:    */s/ Benjamin Helfand*
Benjamin Helfand
D.C. Bar No. 1658708
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
E-mail: Benjamin.Helfand@usdoj.gov
Telephone: 202-252-7059